IN THE UNITED STATES DISTRICT COURT RECEIVED
FOR THE MIDDLE DISTRICT OF ALABAMA

2011 MAY 12  P 1: 25

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* VERONICA MCDONALD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| TECHOTA, LLC, and | ) | **DO NOT PLACE IN PRESS BOX** |
| CAHABA VALLEY HEALTH | ) | |
| SERVICES, INC., d/b/a CAHABA | ) | **DO NOT ENTER ON PACER** |
| VALLEY HOME HEALTH, | ) | **DEMAND FOR JURY** |
| | ) | |
| Defendants. | ) | |

### *QUI TAM* COMPLAINT

Plaintiff-Relator Veronica McDonald, on behalf of herself and the United States of America, alleges and claims against Defendants Techota, LLC ("Techota"), and Cahaba Valley Health Services, Inc. ("Cahaba Valley"), collectively doing business as Cahaba Valley Home Health ("CV Home Health") as follows:

### JURISDICTION AND VENUE

1. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the State of Alabama, transacts substantial business in the State of Alabama, transacts substantial business within this judicial district, and can be found here.  Furthermore, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729, to-wit: Defendant submitted to the United States false claims for payment for home health services that were never performed or were unnecessary and improper and made or used false records to get such claims paid.

## PARTIES

3.     CV Home Health is a Medicare-certified home health agency ("HHA") doing business primarily in Bibb County, Alabama.  CV Home Health is operated by Techota, which is in turn partly-owned and operated by Cahaba Valley.  As described herein, Defendants operate their home health business with the fraudulent intent of maximizing their billing to and reimbursement from the United States through a pattern and practice of: (1) billing the United States for home health services provided to patients that they know are not homebound or otherwise do not qualify for the home health benefit; (2) "upcoding" home health prospective payment data by fraudulently manipulating and altering patient "OASIS" information in order to inflate Medicare prospective payments; and (3)

2

making and using false records indicating skilled nursing visits that were never performed or that did not in fact constitute skilled care.

4.      Plaintiff-Relator McDonald is a licensed registered nurse (RN) with over eight years' experience.  She was employed as an agency director by CV Home Health on October 14, 2010.  Ms. McDonald immediately became aware that CV Home Health's business practices are designed to fraudulently inflate billing to the United States by falsely representing the type and severity of patients' medical conditions.  Ms. McDonald was consistently instructed to falsify and alter patient assessments and nursing notes to create the false appearance that patients required skilled care and qualified for the Medicare home health benefit, resulting in false claims to the United States.

5.      Through her experience, Plaintiff-Relator has witnessed so many instances of fraud as to believe that Defendants' fraudulent tactics are widespread, systematic practices endemic to Defendants.  Defendants' fraudulent conduct offends Plaintiff-Relator as a health care professional and causes her to file this Complaint on behalf of herself and the United States as a relator under the *qui tam* provisions of the False Claims Act.

6.      Prior to filing this Complaint, Plaintiff-Relator voluntarily disclosed to the Government the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A),

3

Plaintiff-Relator is the original source of the information for purposes of that Section. Alternatively, Plaintiff-Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Plaintiff-Relator voluntarily provided that information to the Government before filing this Complaint. Plaintiff-Relator is serving contemporaneously herewith a statement of the material evidence in her possession upon which her claims are based.

## MEDICARE HOME HEALTH COVERAGE

7.     Through the Medicare program administered by the Center for Medicare and Medicaid Services (CMS), the United States provides health insurance to eligible citizens. *See* 42 U.S.C. §§ 1395, *et. seq.* As part of its coverage, Medicare pays for some "home health services" for qualified patients.

8.     To qualify for home health care reimbursement under Medicare, a patient must: (1) be homebound – *i.e.*, the patient is generally confined to her home and can leave only by dent of considerable effort; (2) need part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care established and periodically reviewed by a physician and administered by a qualified home health agency (HHA). *See* 42 U.S.C. §§1395f; 1395x(o).

9.     When a patient so qualifies, Medicare will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. *Id.*

10.     Medicare pays for home health care by way of a Prospective Payment System (PPS). *See* 42 U.S.C. § 1395fff; 42 C.F.R. § 484. The PPS is based on a "national prospective 60-day episode payment," a rate based on the average cost of care over a 60-day episode for the patient's diagnostic group. *Id.*

11.     A patient is placed in a diagnostic group based upon the patient's comprehensive initial assessment by the HHA. 42 C.F.R. § 484.55. Upon a physician's referral, an HHA is required to make an initial assessment visit and perform a comprehensive assessment encompassing the patient's clinical, functional, and service characteristics. *Id.*

12.     Accordingly, a registered nurse must evaluate the patient's eligibility for Medicare home health care, including homebound status, and must determine the patient's care needs using the Outcome and Assessment Set (OASIS) instrument. *Id.*

13.     The OASIS diagnostic items describe the patient's observable medical condition (clinical), physical capabilities (functional), and expected therapeutic needs (service). Based upon the OASIS information – and in turn upon the

expected cost of caring for the patient – the patient's "case mix assignment" is determined and the patient is assigned to one of eighty Home Health Resource Groups (HHRGs).

14.     The patient's HHRG assignment and other OASIS information are represented by a Health Insurance Prospective Payment System (HIPPS) code that is used by Medicare to determine the rate of payment to the HHA for a given patient.

15.     Once the HAA has submitted the patient's OASIS information, partial payment is made by CMS based on a presumptive a 60-day episode.  42 C.F.R. § 484.205.

16.     The initial base rate may be subject to upward adjustment, such as where there is a "significant change in condition resulting in a new case-mix assignment," or downward adjustment, such as where the number of predicted therapy visits substantially exceeds the number actually performed.   42 C.F.R. § 484.205.   Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patient's condition, the health services performed, and the continued need for skilled care. *See* 42 U.S.C. 1395x(o); 42 C.F.R. § 484.84.

17.     In order to continue receiving covered care for another 60-day episode, the patient must be re-assessed by the HHA within the final five days of

6

the initial episode and be re-certified by a physician as requiring and qualifying for home health care.   42 C.F.R. § 484.205.

18.    Medicare will not pay for home health services provided to patients unless those patients are homebound and require intermittent skilled nursing care or skilled therapy.  *See* 42 U.S.C. §1395f.    It is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary.  *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50.    Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

19.    To enroll as a Medicare provider, Defendant was required to submit a Medicare Enrollment Application for Institutional Providers.   *See* CMS Form 855A.  In submitting Form 855A, Defendant made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

7

Form CMS-855A.

20.     Defendant then billed Medicare by submitting a claim form (CMS Form 1450) to the fiscal intermediary ("FI") responsible for administering Medicare hospice claims on behalf of the United States. *See* CMS Form 1450. Each time it submitted a claim to the United States through the FI, Defendant certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

21.     Defendant thus certified that each claim for a home health prospective payment represented home health services provided to a homebound, qualifying patient in need of such services, and CMS expressly conditioned its payment on the truth and accuracy of that certification. Defendant further certified that its programs were in compliance with Medicare regulations, including the requirement that Defendant perform and correctly document its skilled nursing and supervisory visits.

22.     From 2002 to 2006, spending by the United States on home health care rose a precipitous 44%, amounting to nearly $12.9 billion in 2006. According to a report by the Medicare Payment Advisory Commission, HHAs as an industry currently enjoy an average profit margin of nearly 16%. In light of the explosive growth in profits to private companies and cost to Medicare, abuse of the home health system has been identified by CMS as a major concern. In March, 2009, the

Government Accountability Office published a report entitled "Improvements Needed to Address Improper Payments in Home Health." The GAO reported findings that the startling rise in home health spending was caused in part by fraud on the part of HHAs, including: upcoding or overstating the severity of a patient's condition; billing for medically unnecessary therapy visits and other treatment; and billing for services not rendered.

23.    Defendants have engaged in each of the types of fraud identified above as part of their scheme to fraudulently inflate their Medicare billing and defraud the United States.

## DEFENDANT'S FRAUDULENT SCHEMES

24.    Defendants operate their business with the goal of fraudulently inflating profits by submitting false patient assessment data and by billing the United States for health services that are unauthorized, unnecessary, or never performed at all.    Furthermore, Defendants consistently violate Medicare regulations as described below, and their claims to the United States are rendered false thereby.

25.    CV Home Health – a Tennessee concern with no clinical operations in Tennessee – was conceived and is operated with the intent of targeting and taking advantage of the low-income, under-educated, mostly African-American citizens of rural West-Central Alabama.    Owner and operator Jean Robinson ("Robinson")

has frequently told Plaintiff-Relator that Robinson and CV Home Health target the "low-hanging fruit" and frequently uses grossly offensive racial slurs, such as referring to African-Americans as "Black bears." CV Home Health represents the worst manifestation of Medicare fraud, designed to bilk the United States by manipulating its most vulnerable citizens.

A.   **Upcoding: Fraudulently Inflating Payments by Falsifying and Manipulating Patient OASIS Assessments**

26.   Through a system of falsifying and manipulating Medicare-required patient OASIS information, CV Home Health systematically and fraudulently boosts its Medicare prospective payments.

27.   Medicare's home health PPS is intended to cover the projected cost of patient care. To that end, Medicare requires that an HHA registered nurse make an initial visit to each patient and perform a comprehensive assessment using the OASIS instrument. Medicare's prospective payment for that patient is then tied to the type and intensity – and therefore cost – of care that will be required. *See* 42 C.F.R. § 484.55

28.   For example, a patient that is completely bed-bound manifestly requires more care – at greater expense – than a patient that is ambulatory. Similarly, some conditions, such as CVA (stroke) may require extensive, costly, physical and occupational therapy, whereas others, such as minor wound care, may require only limited skilled nursing care and instruction.

10

29.     With the goal of fraudulently placing patients in higher-value groups and boosting Medicare payments, CV Home Health systematically manipulates the home care PPS by recording false OASIS data.  Simply put, CV Home Health trains and coerces its nurses and other employees to make patients look sicker than they are.

30.     To the extent CV Home Health trains its clinical employees at all, it trains them to record false information designed to boost OASIS scores.  Upon her employment with CV Home Health, Plaintiff-Relator received no orientation or training.  Since then, however, she has been frequently instructed on methods for boosting home health PPS payments by recording false patient assessment data.

31.     For example, CV Home Health's nurses are instructed (by Robinson, among others) that if a patient puts her hands on her chair arms in rising from a chair, nurses should record that the patient "requires transfer from bed to chair" (even if the patient can otherwise stand unaided) – thus fraudulently placing the patient in a more acute HHRG and directly resulting in a falsely inflated PPS payment by CMS.

32.     Along the same lines, nearly every patient on CV Home Health's rolls is recorded as suffering from "low vision," even though many of the patients can see adequately or even well.   On one occasion, Plaintiff-Relator McDonald assessed a patient S. B., who wore no glasses and who denied any vision

11

impairment.   When Ms. McDonald discussed the patient with Denise Patterson, CV Home Health Care Coordinator, Patterson instructed Ms. McDonald to have the patient read from a newspaper and to record "low vision" if the patient failed to read every word.  As a result of this tactic, the United States paid an inflated PPS payment that encompassed the cost of care for a vision-impaired patient, even though S.B. did not have vision impairment and S.B.'s care plan included no legitimate costs resulting from any such condition.  This is only one example of numerous such instances of CV Home Health falsely inflating PPS payments.

33.    Defendants systematically and fraudulently place patients in more lucrative HHRGs that do not accurately reflect the type of care or therapy the patients require.  In so doing, Defendants falsely represent to the United States that they are performing certain care that is prescribed and medically necessary, when in fact they are  not – in violation of 42 U.S.C. § 1395f.

**B.    Billing for Ineligible, Non-Homebound Patients**

34.    CV Home Health regularly bills the United States for patients who are not homebound and do not qualify for the Medicare home health benefit, in violation of 42 U.S.C. § 1395f.

35.    Many of CV Home Health's patients simply do not qualify for Medicare home health coverage.  These patients are not home bound and do not require skilled care.  In fact, CV Home Health's caregivers frequently do nothing

12

but visit the patients and bring them soft drinks. Often when CV Home Health receives a patient referral, it admits everyone in the patient's family who is Medicare-eligible, regardless of qualification. Of the 25-30 patients that Plaintiff-Relator saw at any given time as a CV Home Health nurse, less than half actually qualified for the home health benefit.

36.     The following are examples of patients who have been falsely billed to the United States despite their obvious non-qualification:

a.     Patient J. S. was admitted by CV Home Health nurse Alicia Burgiss in or around late-November, 2010. J. S. currently owns and manages the Bibb County Napa Auto Parts store. On one occasion, J. S. asked that a CV Home health nurse perform a visit at the store so that he would not have to interrupt his work schedule to go home for the visit. Patently, J.S. is not homebound and does not qualify for the Medicare home health benefit.

b.     Patient P. N. was admitted along with her two sons, patients R. N. and G. N., though none of them met the criteria for the home health benefit. Dawn Fochtman ("Fochtman"), one of the nurses treating the family, told Plaintiff-Relator McDonald on several occasions that the three did not require skilled nursing care and should not be on service.

c.     Patients W. C. and W. P. were assessed by Dawn Fochtman and classified as "up as tolerated."   CV Home Health Coordinator Veronica Wilkerson, stationed in Tennessee, ordered Fochtman to fraudulently change the patients' status to "bedbound."

### C.     Billing for Unnecessary Care or Care That is Never Performed

37.     CV Home Health routinely bills the United States for purported care that in fact represents no part of any legitimate patient care plan, as well as care that is never performed or only partially performed.

38.     As described *supra,* CV Home Health falsifies its OASIS assessments and plans of care to create the fraudulent appearance that patients' conditions are more acute than they actually are.  In part because many of CV Home Health's patients do not require the care that CV Home Health's false OASIS assessments and care plans require, CV Home Health's nurses regularly record skilled nursing visits when, in reality, CV Home Health's nurses only briefly visit the patient's home and perform no skilled services.  CV Home Health also submits bills for PPS payments reflecting care and therapy that CV Home Health does not provide.

39.     These false records and statements serve as a fraudulent foundation for CV Home Health's claims for PPS payments, allow CV Home Health to avoid "low utilization" repayments, and serve as the basis for fraudulent outlier payments

14

– all in violation of, *inter alia*, 42 U.S.C. §§1395f; 1395x(o) and 42 C.F.R. §§ 484.18;484.30;484.48.

40.     For example, Defendants' nurses regularly perform and record visits when, in actuality, they do nothing but bring the patients soft-drinks or cigarettes. As a result, the United States pays for care that is not required and was never performed.  In actuality, by simply serving as delivery people for soft drinks and cigarettes, CV Home Health is actually contributing to the ill-health of the patients and putting them at greater risk of the nation's biggest health risks, obesity, heart disease and cancer.

41.     Furthermore, CV Home Health submits PPS payments for patients whose care plans require therapy when, in fact, CV Home Health does not have therapists to provide any such care in some areas.  For example, patient J.W. was admitted in or around October, 2010, following knee surgery.  Naturally, J.W.'s care plan called for physical therapy.  Yet, CV Home Health had no physical therapist in the area.  Nonetheless, CV Home Health kept J.W. on its rolls – depriving him of care – and falsely billed the United States for care it never provided.

42.     By and through their actions described herein, Defendants have perpetrated a fraud on the United States Medicare system.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED
## FALSE CLAIMS UNDER 31 U.S.C. § 3729

43.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

44.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –  presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)     Defendants submitted false claims for home health care provided to patients whom Defendants knew were not homebound or did not require skilled care and did not meet Medicare or Medicaid requirements for home health care, in violation of 42 U.S.C. §1395f;

(b)     Defendants submitted false claims for home health care PPS payments that were fraudulently inflated by false OASIS patient assessment data, in violation of 42 U.S.C. §1395f and 42 U.S.C. § 484.20;

(c)     Defendants submitted false claims for home health care that Defendants never provided and did not intend to provide;

16

(d)    Defendants submitted false claims for home health services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

45.    The United States paid the false claims described herein and summarized in paragraph 44(a)-(d).

46.    Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

47.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

17

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR
## RECORDS MATERIAL TO A FALSE CLAIM
## UNDER 31 U.S.C. § 3729

48.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

49.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

a.     Defendants made and used false records reflecting nursing and therapy visits that were not medically necessary, did not qualify as skilled services, or were rendered to patients who did not qualify under the Medicare home health benefit, all in violation of 42 U.S.C. § 1395y(a)(1)(A) and the Medicare regulations cited *supra*;

b.     Defendants made and used false OASIS patient assessment data that inaccurately reflected patient conditions or falsely emphasized conditions that were not part of the patients' legitimate home health needs;

18

c. Defendants made and used false CMS Forms 1450 that reflected fraudulently inflated OASIS scores and were intended to – and did – elicit fraudulently inflated home health PPS payments;

d. Defendants made and used false CMS Forms 1450 and 855A and other false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid when in fact Defendant intended to – and did – defraud the Medicare system by falsely claiming inflated home health PPS payments.

50. The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendants to the United States.

51. In reliance upon Defendants' false statements and records, the United States paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

52. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the

damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 3729(a)(1)(G)

53.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

54.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

(a)     Defendants knew that they had received millions of dollars in home health PPS payments for patients who did not qualify for the Medicare home health benefit, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

20

(b)   Defendants knew that they had received millions of dollars in home health PPS payments that were fraudulently inflated by false patient OASIS assessment information, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

55.   As a result of Defendants' fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendants.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FOUR
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

56.   Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

57.   Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, to-wit: Defendants knowingly billed the United States for patients who did not qualify for the

Medicare home health benefit and knowingly submitted fraudulently inflated bills based on false patient OASIS data.

58.    The United States paid Defendants for such false claims.

59.    Defendants, in concert with their principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

60.    Defendants and their principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare.

61.    Defendants' fraudulent actions, together with the fraudulent actions of their principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United State as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FIVE
## SUPPRESSION, FRAUD, AND DECEIT

62.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

63.    Defendants misrepresented or suppressed the material facts that: (1) that the purported cost of their patient care was exaggerated through OASIS manipulation; (2) that they had failed to perform certain services for which it was paid; and (3) that they performed services that were unauthorized and unnecessary.

64.    Defendants were legally obligated to communicate these material facts to the United States.

65.    Such misrepresentations were made willfully to deceive or recklessly without knowledge.

66.    The United States acted on Amedisys' material misrepresentations described herein to its detriment.

67.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States to Defendants as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States and herself and against Defendants pursuant to 31 U.S.C. § 3732 and Ala. Code §§ 6-5-101, 6-5-102, and 6-5-103 in an amount sufficient to compensate the United States for CV Home Health's fraud, suppression, and

deceit, together with punitive damages in an amount calculated to deter Defendants from engaging in such conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relator may be entitled.

Date:  May 12, 2011.

_____
HENRY I FROHSIN
JAMES F. BARGER JR.
J. ELLIOTT WALTHALL

**Attorneys for Plaintiff-Relator
Veronica McDonald**

**OF COUNSEL**
FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel:   205.933.4006
 Fax: 205.933.4008
henry@frobar.com
jim@frobar.com
elliott@frobar.com

## RELATOR DEMANDS A TRIAL BY STRUCK JURY

## CERTIFICATE OF SERVICE

On this the 12th day of May 2011, Plaintiff-Relator Veronica McDonald

hereby certifies that in compliance with Rule 4 of the Federal Rules of Civil

Procedure, service of the *Qui Tam* Complaint has been executed as follows:

**By Certified Mail to:**

Leura Garrett Canary, USA
U. S. Attorney's Office
131 Clayton Street
Montgomery, AL 36104

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

_____
OF COUNSEL